CV19921522                110393965





**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

**Court of Common Pleas**

**New Case Electronically Filed:**
**September 13, 2019 17:02**

By: ASHLIE CASE SLETVOLD 0079477

Confirmation Nbr. 1816251

CORRIONNE LAWRENCE                    CV 19 921522

vs.

CUYAHOGA COUNTY, ET AL.              **Judge:** WILLIAM T. MCGINTY

Pages Filed: 46



# IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| **CORRIONNE LAWRENCE**<br>c/o The Chandra Law Firm LLC<br>The Chandra Law Building<br>1265 West Sixth Street, Suite 400<br>Cleveland, OH 44113,<br><div align="right">*Plaintiff,*</div><div align="center">v.</div>**CUYAHOGA COUNTY**<br>2079 East Ninth Street<br>Cleveland, Ohio 44115<br>**CHRISTOPHER LITTLE**<br>(in his official and individual capacities)<br>c/o Department of Law<br>2079 East Ninth Street<br>Cleveland, Ohio 44115,<br>**BRANDON SMITH**<br>(in his official and individual capacities)<br>c/o Department of Law<br>2079 East Ninth Street<br>Cleveland, Ohio 44115,<br>**BARRY HICKERSON**<br>(in his official and individual capacities)<br>c/o Department of Law<br>2079 East Ninth Street<br>Cleveland, Ohio 44115,<br>**BEVERLY WITT**<br>(in her official and individual capacities)<br>c/o Department of Law<br>2079 East Ninth Street<br>Cleveland, Ohio 44115,<br><div align="center">and</div>**JOHN DOES 1 AND 2**<br>(in their official and individual capacities)<br>c/o Department of Law<br>2079 East Ninth Street<br>Cleveland, Ohio 44115,<br><div align="right">*Defendants.*</div> | Case No.<br><br>Judge |

## COMPLAINT WITH JURY DEMAND

## NATURE OF ACTION

1.     This is a civil-rights action brought to redress the physical and psychological abuse

Plaintiff Corrionne Lawrence endured at the hands of Cuyahoga County corrections officers.

Corrections staff allowed Stacy Norris, a man being held for the murder of Mr. Lawrence's

cousin, to attack him (even though he had advised two supervisors of the risk Norris posed). After

that attack, a corrections officer beat Mr. Lawrence while he was handcuffed and compliant in

an elevator where staff know the security camera is inoperable. Then, an officer threatened to

mace Mr. Lawrence, and to hang him and "make it look like a suicide." When he reported the

abuse to federal investigators, corrections staff retaliated, including serving him rotten food (even

more rotten than the usual food) and denying him access to basic hygiene. Mr. Lawrence was

relocated for his protection only after the United States Marshals Service demanded it, telling the

former sheriff that Mr. Lawrence "must be moved today, the SRT [Special Response Team] is

actively threatening and targeting him!!!" (The Special Response Team is a team of corrections

officers who dress in black paramilitary garb and respond to various incidents within the jail.

Nicknamed "The Men in Black," they have a reputation for brutal ferocity in their treatment of

those in custody.)

2.     Cuyahoga County has cultivated and nurtured a climate of abuse, retaliation, violence,

and corruption in its jail, in particular with the SRT. The County knew well before Mr.

Lawrence was injured that its officers were abusing incarcerated citizens. Yet it did nothing to

prevent or rectify the abuse Mr. Lawrence and others have experienced. When federal marshals

began investigating the dismal conditions, corrections officers panicked and amped up their

threats against those under their care, complaining that Mr. Lawrence and others "were

snitches" for exercising their constitutional rights to report government misconduct—including

exposing the punitive violence doled out by the SRT, describing the red-zoning caused by

overcrowding and understaffing, and other sub-standard conditions in the jail. Mr. Lawrence and his fellow incarcerated citizens had the right to report on the abuse they endured without fear of reprisal.

## PARTIES

3.     Plaintiff Corrionne Lawrence is a resident of Cuyahoga County. At all times relevant, Mr. Lawrence was held in the Cuyahoga County Corrections Center ("the county jail" or "the jail").

4.     Defendant Cuyahoga County is a political subdivision of the state of Ohio responsible for the county jail.

5.     Defendant Christopher Little is an SRT officer with the jail and resides at ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ At all times relevant, he was in uniform and acting under color of state law.

6.     Defendant Brandon Smith is an SRT officer with the jail and resides at ▮▮▮▮▮ ▮▮▮▮▮▮ At all times relevant, he was in uniform and acting under color of state law.

7.     Defendant Barry Hickerson is an SRT officer with the jail and resides at ▮▮▮▮▮ ▮▮▮▮▮▮▮ At all times relevant, he was in uniform and acting under color of state law.

8.     Defendant Beverly Witt is a corrections officer with the jail and resides at ▮▮▮▮▮ ▮▮▮▮▮▮ At all times relevant, she was in uniform and acting under color of state law.

9.     Defendant John Doe 1 is a corrections officer with the jail. At all times relevant, he was in uniform and acting under the color of state law.

10.     Defendant John Doe 2 is an SRT officer with the jail. At all times relevant, he was in uniform and acting under the color of state law.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction because this action concerns state-law violations by

Defendants, and the amount in controversy exceeds $15,000.

12.     This Court has personal jurisdiction over Defendants, who are located, work, and/or

reside in Cuyahoga County. Venue is proper because the events giving rise to Mr. Lawrence's

claims took place in Cuyahoga County.

## FACTUAL BACKGROUND

### During his booking, a corrections officer confined Mr. Lawrence to a restraint chair as a punishment for speaking Spanish.

13.     On September 16, 2018, Mr. Lawrence was arrested on a probation violation and

booked into the county jail. While being booked, Mr. Lawrence initially answered the booking

officers' questions in Spanish.

14.     The booking officers expressed irritation with Mr. Lawrence's efforts to communicate in

Spanish and eventually called for an interpreter (another corrections officer). The interpreting

officer insisted Mr. Lawrence was "just giving [them] a hard time," and said, "he's bullshitting,

put him in the chair." By "the chair," Mr. Lawrence understood the interpreting officer to be

referring to a restraint chair. And he was right.

15.     The County's written policy regarding using restraint chairs (Policy Number 0003)

prohibits their use as a form of punishment or discipline. But corrections personnel regularly and

customarily engage in the practice of confining inmates to restraint chairs as a punitive measure.

The County has long been aware that its corrections staff do this and has accepted this practice

as its own.

16.     As a punishment for speaking Spanish, one of the booking officers, Defendant John

Doe 1, strapped Mr. Lawrence into a restraint chair. Mr. Lawrence posed no threat of harm to

himself or others and was not disrupting normal jail operations. Speaking Spanish is not an impediment to completing the booking process. On information and belief, the jail regularly completes the booking process in Spanish without any disruption to its normal operations.

17.     After confining Mr. Lawrence to the restraint chair as a punitive measure for speaking Spanish, corrections staff locked him in a freezing-cold room, alone, for approximately four hours. For those four hours, no one came to check on him. He remained confined in the restraint chair with no access to food, water, or bathroom facilities.

18.     After four hours, a corporal asked Mr. Lawrence: "Are you ready to cooperate?" Mr. Lawrence responded in English that he was. Only then did the punishment end and Mr. Lawrence was released from the restraint chair.

19.     On information and belief, this use of the restraint chair against Mr. Lawrence was not ordered by the shift supervisor (as required by the County's written policy).

20.     This use of the restraint chair against Mr. Lawrence was not documented in a report (as required by the County's written policy).

**Despite being on notice that Mr. Norris posed a threat to Mr. Lawrence, jail staff assigned them to the same pod and allowed Mr. Norris to attack Mr. Lawrence.**

21.     After booking, two corporals took Mr. Lawrence up to the fourth floor for pod assignment. Before being assigned a pod, Mr. Lawrence told the corporals that he must be kept separate from another person he knew to be in the jail, Stacy Norris. In 2016, Mr. Norris murdered Mr. Lawrence's cousin, Dexter Williams. Mr. Lawrence advised the corporals transporting him of these facts. One of the corporals responded, "We'll see what we can do." Mr. Lawrence was initially assigned to pod 8-G (a different pod than Mr. Norris).

22.     Given Mr. Lawrence's specific statements to the corporals transporting him from booking to pod assignment, the jail should have never permitted Mr. Lawrence and Mr. Norris to be assigned to the same pod.

23.     Inexplicably, on October 17, 2018, the jail reassigned Mr. Lawrence to pod 8-D, where Mr. Norris had been assigned for some time. This was the first time the two men interacted since Mr. Lawrence's cousin's murder.

24.     As a corrections officer brought Mr. Lawrence into pod 8-D, Mr. Norris—who was locked in his cell—began threatening Mr. Lawrence with violence. There was another corrections officer sitting at the desk in the pod within earshot of Mr. Norris who must have heard him verbally threaten Mr. Lawrence through the cell window as he was led through the pod's day room to his new cell.

25.     Throughout the evening and through the night—within earshot of corrections personnel and the other men assigned to the pod—Mr. Norris hollered from his cell on the other side of the pod that he was going to attack Mr. Lawrence as soon as his cell door opened the next morning saying, among other things, "When the doors pop, be ready!"

26.     On information and belief, numerous corrections personnel heard Mr. Norris threaten Mr. Lawrence that evening, through the night, and into the following morning.

27.     Anticipating being attacked the following morning, and not knowing which of the other men assigned to the pod were aligned with Mr. Norris and might join in his announced attack, Mr. Lawrence did not sleep.

28.     Anticipating the attack, Mr. Lawrence prepared the only self-defense option at his disposal: he urinated into an empty milk container and readied it to deploy if jail staff allowed Mr. Norris to attack in the morning.

29.     On the morning of October 18, corrections officer Defendant Beverly Witt began unlocking each of the cells around the pod's small day room. She opened Mr. Norris's door first. As she did, Mr. Norris yelled to Mr. Lawrence, "I hope you're ready!" Defendant Witt displayed no curiosity regarding Mr. Norris's statements and continued unlocking cell doors.

30.     As Defendant Witt worked her way to Mr. Lawrence's cell door, Mr. Norris walked around dapping up the other men in the pod, proclaiming that he was "about to crash out." This is a slang term for being sent to disciplinary isolation or administrative segregation (solitary confinement) for fighting. Mr. Norris also stated that he was "about to go to the hole" and that he was going to "fuck this n***** up" (referring to Mr. Lawrence).

31.     From his cell, Mr. Lawrence witnessed Mr. Norris's camaraderie with the other men in the pod. His concern grew about whether others might join in the attack Mr. Norris had declared was imminent. Despite Mr. Norris making no secret of what he was about to do, Defendant Witt ignored his clear threats and continued unlocking cell doors, working her way around the pod to Mr. Lawrence's cell.

32.     Mr. Norris stood right behind Defendant Witt as she opened Mr. Lawrence's cell. This, too, should have been cause for concern to Witt, because standing right behind a corrections officer as she unlocks another person's a cell door is unusual behavior in the jail setting and typically indicative that the hovering individual intends violence.

33.     Mr. Norris's odd positioning and his audible threats gave Defendant Witt reason to believe that Mr. Norris was about to attack Mr. Lawrence. But she persisted in opening his cell door anyway.

34.     From inside his cell, Mr. Lawrence could see Mr. Norris positioned behind Defendant Witt, prepared to attack. Witt shifted behind the cell door as she opened it, giving Mr. Norris a clear path to Mr. Lawrence. Hoping to thwart the impending assault, Mr. Lawrence deployed a

preemptive strike, tossing the milk carton's contents at Mr. Norris. This action halted Mr. Norris's progress only briefly.

35.     Quickly regrouping from the urine splash, Mr. Norris burst into Mr. Lawrence's cell, jumped on top of him, and began to attack him. Defendant Witt immediately stepped away, doing nothing to stop the attack and failing to control Mr. Norris and prevent intimidation of or physical harm to Mr. Lawrence by Mr. Norris. Mr. Lawrence justifiably defended himself as Mr. Norris made good on his threat to attack Mr. Lawrence.

36.     Several minutes later, SRT personnel arrived and ended Mr. Norris's attack.

37.     Defendant Witt was never disciplined for her role in facilitating and/or failing to prevent or end Mr. Norris's attack on Mr. Lawrence.

### Corporal Christopher Little deactivated his body-worn camera, took Mr. Lawrence into an elevator generally known not to have a functioning surveillance camera, and beat Mr. Lawrence while he was handcuffed and compliant.

38.     Mr. Lawrence was not visibly injured in Mr. Norris's attack.

39.     The responding corrections personnel were more concerned with Mr. Lawrence having thrown urine—and Defendant Witt's assertion that he had splashed her—than the fact that she had facilitated Mr. Norris's premeditated and openly announced attack on Mr. Lawrence.

40.     Mr. Lawrence was handcuffed and escorted out of the pod by SRT personnel. Defendant Corporal Christopher Little and Corporal Brandon Honaker took Mr. Lawrence by elevator to the sixth floor medical unit. A nurse briefly examined him and he signed a notice acknowledging he had no injuries from the Norris attack.

41.     Defendant Little and Corporal Honaker then escorted Mr. Lawrence to an elevator generally known to have no functioning security camera. SRT personnel commonly use this elevator to dole out brutal retribution on incarcerated people because staff know that their

conduct is not being recorded. County employees understand and expect that they can get away with violence so long as it is not captured on video. This is because corrections officers are accustomed to getting away with hurting people without consequence.

42. Under the County's written policy on body-worn cameras, both Little and Honaker should have activated their cameras and kept them rolling through Mr. Lawrence's trip to the medical unit and to his subsequent confinement in administrative segregation following the elevator trip. Little and Honaker did not do so.

43. Once the elevator doors opened, Defendant Little ordered Mr. Lawrence to stand facing against the back wall. He complied. As the doors shut, Defendant Little said, "Let's play a game."

44. Defendant Little suddenly delivered a powerful punch to right side of Mr. Lawrence's head, cracking his face into the metal wall. The blow brought Mr. Lawrence to the floor. He could feel blood coming from a wound above his left eyebrow. Defendant Little pummeled Mr. Lawrence as he lay in handcuffs on the elevator floor. Defendant Little punched, kicked, and stomped Mr. Lawrence. Corporal Honaker did nothing to stop the attack.

45. Mr. Lawrence tried to shield his body from the beating, but his handcuffs prevented him from doing so. At one point, Mr. Lawrence tried to stand up, thinking the attack was over, only to have Defendant Little punch him in the stomach, knocking him back down.

46. Defendant Little is trained in martial arts.

47. Finally, the elevator doors opened, and the vicious attack ended.

48. Defendant Little dragged Mr. Lawrence to his feet and ordered him to exit the elevator. Mr. Lawrence complied.

49. After exiting the elevator, Mr. Lawrence saw Defendant Brandon Smith standing in front of the control room on the tenth floor.

50.     Mr. Lawrence and Defendant Smith both grew up in the St. Clair area. They went to the same bars and knew the same people outside of jail. They were acquainted long before Mr. Lawrence came under Smith's care at the jail.

51.     Defendant Smith told Defendant Little and Corporal Honaker to place Mr. Lawrence in cell 10-B. As Defendant Little was taking the handcuffs off Mr. Lawrence in the cell, he said, "N**** betta keep yo' fuckin' mouth shut up here, or you gon' see me again." Mr. Lawrence understood Defendant Little to be communicating that Lawrence would face retribution if he reported the elevator attack.

52.     Defendant Smith saw Mr. Lawrence bloodied as he returned to his cell. Rather than report Defendant Little or even inquire about Mr. Lawrence's injuries, Smith laughed at the evident assault. This is consistent with Cuyahoga County's culture of deliberate indifference to brutal violence exacted by the SRT on incarcerated citizens.

53.     Mr. Lawrence asked to be taken back to the medical unit. Defendant Smith looked at Mr. Lawrence, laughed again, and said, "Better stop bumpin' yo' head on the wall." Smith refused Mr. Lawrence's request for medical attention and gave him a paper towel to wipe his wound.

54.     Defendant Little did not expect Mr. Lawrence would soon be returning to the medical unit. But during the attack Mr. Lawrence had defended himself in part by biting Mr. Norris, and jail protocol requires bloodwork be completed under those circumstances. So Mr. Lawrence was headed back to medical despite corrections staff's expectation that Mr. Lawrence would be stuck in his cell for the foreseeable future and not observed by any medical staff.

### Defendant Little yanks Mr. Lawrence from the medical unit to prevent him from reporting Little's elevator attack to medical staff.

55.     Defendant Little made sure to accompany Mr. Lawrence for his required trip back to the medical unit to have his blood drawn. Mr. Lawrence was fearful that Little would beat him again

if he reported the elevator attack. Little intended to monitor Mr. Lawrence to ensure that he didn't report the assault to the medical staff.

56.     Once in medical, Defendant Little insisted upon being in close proximity to Mr. Lawrence while he had his blood drawn so that Little could monitor what Mr. Lawrence said to medical staff. The individual drawing his blood asked how Mr. Lawrence got his head injury, which he had not had an hour earlier when he was seen in the medical unit.

57.     Hesitant to report Defendant Little's attack in his presence, Mr. Lawrence visibly hesitated and did not answer the question. The staff member drawing his blood looked from Mr. Lawrence to Little and did not ask again. She arranged for a nurse to take care of his head wound.

58.     Mr. Lawrence was taken to a different exam room where another nurse asked how Mr. Lawrence received his new head injury that he had not had when he was seen earlier that morning.

59.     Again, Mr. Lawrence was hesitant to report Defendant Little's attack in his presence. Mr. Lawrence responded, "I don't feel comfortable talking about it with him right here," gesturing toward Defendant Little.

60.     Defendant Little suddenly erupted saying, falsely, "refusing treatment" and pulled Mr. Lawrence away from the nurse, and out of the medical unit. Mr. Lawrence stated that he was not refusing treatment, but Defendant Little dragged him by the arm back to the elevator. The nurse was left standing with the supplies in her hands.

61.     Mr. Lawrence's head wound was not treated. No one follow up to investigate why Defendant Little dragged Mr. Lawrence from the medical unit when he clearly wanted to have his injury treated. Other than the limited, reflexive inquiries from the medical staff, no one

seemed remotely interested in why a man who had been seen an hour earlier suddenly had a new head injury that he did not want to discuss in front of the corrections officer escorting him.

### Corrections staff banish Mr. Lawrence to disciplinary isolation for "fighting" even though jail staff had failed to act to prevent Mr. Norris's attack on Mr. Lawrence.

62.   Mr. Lawrence—the victim of not one but two unprovoked attacks that morning—was then punished for "fighting" with Mr. Norris. Corrections staff housed Mr. Lawrence in disciplinary isolation and further limited his liberty with draconian deprivations.

63.   Mr. Lawrence was, in essence, blamed for an attack that jail staff had failed to meet its constitutional duty to prevent. Mr. Lawrence had reported to two supervisors that he and Mr. Norris should be kept separate. But the jail assigned them to the same pod and ignored Mr. Norris's repeated threats to harm Mr. Lawrence. And Mr. Norris's clear and repeated threats to Mr. Lawrence from the moment corrections staff brought him into pod 10-B further alerted the staff to the risk Mr. Norris posed. Nevertheless, the jail punished Mr. Lawrence when its own failure to protect Mr. Lawrence led to the predictable outcome.

64.   In administrative segregation, the jail limited or curtailed entirely Mr. Lawrence's access to personal hygiene items, writing materials, commissary, regular meals, and family visitation. Typically, Mr. Lawrence was restricted to just 20 minutes a day outside of his cell, when he was able to shower and access his personal items. But the jail would sometimes keep Mr. Lawrence in total solitary confinement for days at a time, not even allowing him to shower.

65.   The jail never gave Mr. Lawrence a hearing on the severe administrative-segregation restrictions it subjected him to following the Norris attack.

**Mr. Lawrence asks for a shower; in response, a corrections officer threatens to "mace" Mr. Lawrence and to hang him and "make it look like a suicide."**

66.     On one day when corrections staff were not allowing Mr. Lawrence to shower, he pressed the point, repeatedly asking to shower.

67.     In response to Mr. Lawrence's requests to shower, Defendant John Doe 2—a bald, white corrections officer—opened Mr. Lawrence's cell, withdrew a pepper-spray canister, and held it an inch from Mr. Lawrence's face. Doe 2 threatened to "mace" Mr. Lawrence if he did not stop asking for a shower. Doe 2 then threatened to hang Mr. Lawrence and "make it look like a suicide." Doe 2 then left Mr. Lawrence's cell.

68.     The County's written policy regarding the use of chemical agents such as pepper spray or mace (Policy Number 0028) indicates that it shall never be used or administered as a punishment. But that policy is not enforced. As the incarcerated population understands all too well, Cuyahoga County corrections officers regularly and customarily engage in the practice of using chemical agents to punish those in custody.

69.     Because of his understanding of how corrections staff liberally deploy chemical agents on the slightest whim without any just cause or need to do so and face zero consequences, Mr. Lawrence was fearful of the threatened abuse.

70.     A short time after threatening to kill Mr. Lawrence, Defendant Doe 2 returned with Defendant SRT Officer Barry Hickerson, and another SRT officer.

71.     One officer handcuffed Mr. Lawrence through the cell-door port. After handcuffing him, all three officers entered the cell. Mr. Lawrence feared these men were coming to hang him as Doe 2 had threatened.

72.     The officers told Mr. Lawrence to step to the back of the cell and face the window. He complied. Defendant Hickerson then smashed Mr. Lawrence's face into the wall repeatedly.

Hickerson told Mr. Lawrence to "sit the fuck down for the rest of the night" or "you're going to the chair."

73.     Mr. Lawrence understood "the chair" to mean the restraint chair, where corrections officers regularly restrain and beat incarcerated citizens as punishment for minor infractions.

74.     Having been restrained for speaking Spanish, Mr. Lawrence believed that these guards would not hesitate to put him in the chair for asking for a shower.

### Mr. Lawrence reports abuse and corruption to investigators with the United States Marshals Service.

75.     Beginning in late October and into early November 2018, investigators with the United States Marshals Service appeared unannounced at the county jail to assess jail conditions. Corrections staff were surprised and visibly stressed by the investigation.

76.     On approximately October 30, two U.S. marshals appeared in Mr. Lawrence's pod. It was generally understood by employees and those incarcerated that the marshals were investigating jail conditions.

77.     When those incarcerated in Mr. Lawrence's pod, 10-B, heard that "the feds" were in the adjacent pod and would be coming to 10-B next, a number of the men expressed their desire to speak with the investigators.

78.     The marshals came into 10-B pod with notepads and indicated that they wanted to know about prison conditions.

79.     When one of the marshals came to Mr. Lawrence's cell, he told her that a corrections officer had beaten him up while he was in handcuffs. She asked to have his door opened.

80.     An SRT officer tried to prevent her from entering saying he could not open Mr. Lawrence's door because "this one throws piss."

81.　　Undeterred, the marshal ordered the officer to open the cell door so she could interview Mr. Lawrence.

82.　　Defendant Smith tried to step into Mr. Lawrence's cell during the interview, but the marshal ordered him out.

83.　　During his meeting with the marshal, Mr. Lawrence truthfully reported the abuse and corruption he had experienced in the jail even though he knew that SRT officers were listening to their conversation.

84.　　Other men in pod 10-B likewise cooperated with the marshals, sharing details about corruption and abuse in the county jail.

### Jail staff retaliate against Mr. Lawrence for cooperating with the federal investigation.

85.　　The corrections staff's campaign of retaliation began immediately after the marshals left the pod. Staff became panicky and threatened retribution. They began to refer to Mr. Lawrence and others who had spoken out about abuses in the jail as "snitches." Staff reduced Mr. Lawrence's diet to spoiled milk, rotten fruit, and moldy bread. He was not served an edible meal for the remainder of his time in the jail.

86.　　On approximately October 31, Defendant Smith personally escorted Mr. Lawrence from his pod to another area of the facility for a follow-up interview with the marshals. En route, Smith said to Mr. Lawrence, "Why you snitchin'? You a snitch now! Trying to get my boy indicted!" (When Defendant Smith referred to his "boy," Mr. Lawrence understood Smith to be referring to Defendant Little, who had attacked Mr. Lawrence in the elevator.) Smith continued, "That's crazy you about to talk to these people. That ain't right, that's snitchin'. St. Clair don't breed snitches. Y'all are messing up my life."

87. At his follow-up interview with federal investigators, Mr. Lawrence described the corruption and abuse at the county jail, which is a matter of public concern.

88. Other incarcerated individuals likewise cooperated with the marshals as they investigated abuses at the jail.

89. As the investigation proceeded and SRT officers faced the fact that their conduct was under scrutiny—and maybe somehow perhaps might lead to actual consequences—the retaliation intensified.

90. Defendant Smith retaliated by aggressively antagonizing the inmates under his supervision including Mr. Lawrence, saying, e.g.: "These n****s fuckin' with my life! Nobody getting showers. I ain't doin' shit for you if you gon' be snitchin'." Defendant Smith specifically threatened Mr. Lawrence, "You'll be dealt with for snitching." Mr. Lawrence understood Defendant Smith to be threatening physical violence or death based on Mr. Lawrence's cooperation with federal investigators.

91. Defendant Smith was not the only corrections officer angered and stressed by the jail population's cooperation with the federal investigation. Other corrections officers who were known to be bringing contraband (drugs, phones, etc.) into the jail or who commonly doled out indiscriminate beatdowns to those in custody were also fearful that their wrongdoing would be exposed. The climate of retaliation was intense as corrections personnel endeavored to curtail cooperation with the marshals' investigation.

92. With tensions rising in the pod and given Defendant Smith's threat, Mr. Lawrence was reluctant to meet with the marshals again. He believed jail staff would kill him if he continued to openly cooperate.

93. Mr. Lawrence weighed his options. When the marshals again returned to his pod, he managed to slip a note to one of them recounting the retaliation he was facing. That marshal

read the note and assured Mr. Lawrence that he (the marshal) would take care of the situation personally.

94.     On November 1 at 1:54 p.m., Theo Anderson, Chief of the Prisoner Operations Division, Office of Detention Standards and Compliance, United States Marshals Service e-mailed former Cuyahoga County Sheriff Clifford Pinkney under the subject heading "Whistleblowing Protection." Chief Anderson asked Sheriff Pinkney to immediately remove Mr. Lawrence and several other incarcerated citizens from the jail "for their personal safety and protection from the Security [sic] Response Team (SRT) staff." Chief Anderson's email is attached as Exhibit 1.

95.     Mr. Lawrence's name occupies the first slot on the list. His name is bolded and underlined, and includes an urgent note from Chief Anderson to Sheriff Pinkney: "Sir, he must be moved today, the SRT is actively threatening and targeting him!!!).

96.     Chief Anderson's transfer request also sought to have the following men transferred: Brandon Singleton, Rajuan Jackson, Ramone Cargill, Clarence Bogan, Richard Morris, Jonathan Rivera, James Jones, and William Ambler. Chief Anderson asked that those men and Mr. Lawrence "be placed in protection or moved from the Cuyahoga County Jail for their personal safety and protection from the [Special] Response Team (SRT) staff." Anderson explained that the men "are in fear of their life for 'whistleblowing' on staff corruption and assault." Before listing the men's names, he said, "I respectfully request these individuals be removed and relocated immediately, for their safety and protection, as they fear for the live[s] and personal safety."

97.     In January 2019, Mr. Lawrence sought public records under R.C. 149.43 regarding his confinement at the jail from Cuyahoga County. The County failed to provide Chief Anderson's emailed request that Sheriff Pinkney relocate Mr. Lawrence until *after* he filed a mandamus action in the Supreme Court of Ohio to enforce his public-records request. That mandamus

action remains pending. He continues to seek additional records that—based on the County's own policies—should exist that the County has, as yet, failed to provide.

98.     On information and belief, each of the men listed in Chief Anderson's transfer request to Sheriff Pinkney had experienced retaliation from SRT personnel because the men were participating in the federal investigation including reporting staff abuse and corruption and deplorable conditions at the county jail.

99.     That evening, Mr. Lawrence was transferred out of the county jail to the Euclid annex (also run by Cuyahoga County) where he continued to experience retaliation from other Cuyahoga County corrections staff because he had spoken out about abuse at the jail.

100.    Mr. Lawrence was eventually transferred to the Geauga County jail for the duration of his criminal proceedings.

101.    Mr. Lawrence filed a written grievance with the jail detailing the abuse he suffered. The jail never responded to him.

### OTHER INCIDENTS RESULTING FROM THE MALICIOUS, BAD-FAITH, WANTON, AND RECKLESS EXERCISE OF DISCRETION AT THE COUNTY JAIL

102.    In addition to the above-described treatment of Mr. Lawrence—including the campaign of retaliation that followed his reports to federal officials regarding the corruption and abuse running rampant in the jail—corrections staff, as part of a custom, policy, pattern, and practice, have perpetrated many additional unprovoked and unwarranted acts of violence on the people incarcerated in the jail along with other constitutional-rights violations. Some of those acts are described in the following paragraphs.

### A corrections officer smashed Joshua Castleberry's teeth into his nose for throwing a bologna sandwich.

103.    On February 5, 2018, Joshua Castleberry was in the county jail. He secreted an extra bologna sandwich from the dining hall to his cell, and, when nabbed, he threw the sandwich at

jail staff. The officers' response to the indignity was savage. After handcuffing Mr. Castleberry, officers John Wilson and Jason Jozwiak smashed Mr. Castleberry's face so violently into the ground that his front teeth came out of his nose. They placed him in a restraint chair and jammed a mask over his broken face to conceal their assault from medical staff.

104.    At the time, Ken Mills was the administrator of the jail. (Mills has since resigned and been indicted based on his jail-related conduct.) His officers refused to let nursing staff remove the mask to assess Mr. Castleberry's injuries, but a night nurse saw Mr. Castleberry and requested medical evaluation. The security supervisor refused, saying: "He wants to try and hit one of my officers — he can sit the fuck there for hours."

105.    The night nurse called the nursing supervisor — Gary Brack, R.N. — at home, reporting a serious medical emergency. Nurse Brack called the staff sergeant in charge and demanded a medical evaluation, but the Defendant County waited another half-hour before transporting Mr. Castleberry to medical. The mask was lifted, EMS was called, and Mr. Castleberry was transported to the hospital for surgery to remove the tooth from his nasal cavity and reconstruct his face.

106.    The next day at the monthly sheriff's meeting, Mills covered up the abuse. When asked about the incident, Mills stated: "I reviewed the situation and the officers used appropriate force to the threat of what the incarcerated citizen was using." Medical Director Dr. Thomas Tallman asked to view the security footage, but Mills refused, saying: "I already reviewed it — nothing was done wrong."

107.    Former Sheriff Clifford Pinkney stated that he would follow up with the incident, but when he went to review the footage, the security and body-camera footage had somehow "disappeared."

108.    Wilson was indicted for felonious assault in the second degree and misdemeanor charges

of interfering with civil rights and unlawful restraint. Jozwiak was charged with unlawful restraint

and interfering with civil rights.

109.    No one else was held accountable.

110.    The treatment this individual endured is consistent with the jail's custom, policy, and

practice of using excessive force as a punitive measure and otherwise victimizing and abusing the

individuals detained there.

### Corrections officers emptied a can of pepper spray in Chantelle Glass's face while she was confined in a restraint chair, and failed to decontaminate her to prolong her agony.

111.    Chantelle Glass was booked into the county jail on July 16, 2018 after police discovered a

warrant stemming from an outstanding traffic ticket.

112.    Ms. Glass requested a phone call so that she could inform her family of her arrest, and

contact an attorney. The guards repeatedly refused Ms. Glass's request even though anyone who

watches Law & Order knows that everyone under arrest is entitled to a phone call.

113.    When Ms. Glass persisted in her request after being placed in a holding cell, corrections

officers threatened that if she did not stop, they would tie her down and "mace" her. Ms. Glass

continued to request her phone call, and officers called Corporal Idris-Farid Clark, a supervisory

officer.

114.    Corrections officer Robert Marsh retrieved a restraint chair. Video surveillance shows

Clark remove his can of pepper spray from his tactical vest, shake it, and return it to his vest

pocket before Ms. Glass was even brought out of her cell.

115.    Ms. Glass cooperated as officers escorted her out of her cell in handcuffs, and strapped

her into a restraint chair. As Marsh continued tightening the restraints, Clark again took out his

pepper spray and again shook the canister.

116.     When Marsh reached between Ms. Glass's knees, she instinctually drew her legs together

out of fear. She made no other movements. Ms. Glass—strapped into the restraint chair—could not

pose any threat to the officers.

117.     Rather than step back when Ms. Glass flinched, Marsh stepped in and punched her in

the head. She flailed in her restraints, trying in vain to protect herself.

118.     Corporal Clark than stepped up to make good on his colleague's threat to "mace" Ms.

Glass. He emptied an entire canister of pepper spray onto Ms. Glass's face. Ms. Glass tried to

turn her head to avoid the spray, but Mr. Clark grabbed her hair to hold her head still while

deploying the pepper spray inches from her eyes.

119.     When the attack concluded, Ms. Glass asked Clark: "Why did you mace me?" He

responded: "Because you talk too much."

120.     Rather than providing Ms. Glass with prompt and adequate medical care, the officers

wheeled her to a utility closet. Minutes passed before officers began "decontamination" by thrice

spritzing Ms. Glass's face and the top of her head with water. This did not effectively

decontaminate Ms. Glass (nor was it intended to). Pepper spray still covered her face, neck, and

chest after the "decontamination" concluded.

121.     Clark then wheeled Ms. Glass to the medical unit. Having access to medical personnel

did not improve matters given the medical staff's participation in the corrections officers'

deliberate indifference to and apparent enjoyment of Ms. Glass's agony. The sole "medical care"

provided by Nurse Diane Lessmann was dabbing Ms. Glass's eyes with gauze. This nurse did not

explain to Ms. Glass what was happening to her or display any compassion for her pain.

122.     When Ms. Glass left the medical unit, pepper spray was still visible on her face, neck, and

chest. Ms. Glass was placed alone in an isolation cell still restrained and covered in pepper spray

for over two hours and denied her access to food, water, and the opportunity to use the restroom facilities.

123.    For her entire 48-hour stay in the jail, corrections staff denied Ms. Glass's requests to shower.

124.    For her entire 48-hour stay in the jail, Ms. Glass remained in the same clothing contaminated with pepper spray and urine.

125.    Ms. Glass was released on July 18, 2018 after New Jersey officials confirmed that they did not want her extradited on the old warrant.

126.    The treatment this individual endured is consistent with the jail's custom, policy, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

### Blanche Hill endured a 12-hour confinement to a restraint chair, denied access to restroom by jail staff.

127.    Also in July 2018, Blanche Hill was booked into the county jail.

128.    Without any legitimate reason to do so, jail staff confined Ms. Hill to a restraint chair for many hours and denied her food, water, and the opportunity to use the restroom facilities.

129.    The jail held no one accountable.

130.    The treatment this individual endured is consistent with the jail's custom, policy, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

### A corrections officer choked and dragged Tyrone Hipps, Jr. because he complained about being denied the opportunity to pray.

131.    Tyrone Hipps, Jr. was booked into the county jail on June 22, 2018. He informed the officers that he is a Muslim and requested a no-pork diet.

132.    Practicing Muslims must pray five times per day, facing east toward the holy city of

Mecca.

133.    On November 3, 2018, Mr. Hipps was preparing to pray at the eastern end of his

dormitory when Officer Christopher Perdue approached Mr. Hipps and told him to go to his

bed area. Mr. Hipps explained that he was about to pray. Perdue said: "Pray by your bed." Mr.

Hipps explained that praying by his bed was improper because he is required to pray facing the

east with no one walking in front of him. Perdue then told Mr. Hipps to go pray in the day area.

Mr. Hipps explained that praying in the day area would also be improper because people would

still be in front of him while he was praying. Mr. Hipps tried to explain the importance of

observing proper prayer protocols.

134.    In response to Mr. Hipps's explication of his religious custom, Perdue threatened to send

Mr. Hipps to the hole. Mr. Hipps asked Perdue to get the corporal to resolve the issue. Perdue

left, returned a few seconds later (without the corporal), and threatened: "I'm going to give you

three chances to move, if you don't move by the third, I'm going to move you myself."

135.    Mr. Hipps complied with Perdue's command, picked up his prayer rug, and walked

towards his bunk. He said: "This is my religion. I could sue you for this." Perdue responded: "I'll

give you something to sue for." Perdue grabbed Mr. Hipps and put him in a chokehold. Perdue

dragged Mr. Hipps to the front of the pod, threw him on his face, and told him to stop resisting.

136.    Another officer had to physically remove Perdue from Mr. Hipps.

137.    Despite having done nothing wrong, Mr. Hipps spent the next five days in the hole.

138.    He remained in the hole for two days after an investigator visited Mr. Hipps in the hole

and confirmed that the video showed he had done nothing wrong.

139.   Despite Perdue's vicious attack on Mr. Hipps, jail administration did not place Perdue on leave or even separate Perdue from Mr. Hipps. Perdue constantly taunted Mr. Hipps when he returned from the hole.

140.   No one has been held accountable for attacking Mr. Hipps.

141.   The treatment this individual endured is consistent with the jail's custom, policy, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

### A corrections officer attacked Glenn Mayer, Jr. as he was receiving medication in the medical unit.

142.   Glenn Mayer, Jr. was in the county jail in October 2018. Mr. Mayer has a medical condition that causes him to twitch. Mr. Mayer takes medication to help control his condition.

143.   On October 16, 2018, during the evening medication pass, a nurse was administering Mr. Mayer's medication, steadying his hand to place the medication into it. Mr. Mayer began to twitch. Officer Darriell Hayes gripped Mr. Mayer's neck from behind and choked him.

144.   The nurse told Hayes to leave Mr. Mayer alone, that it was normal for him to twitch in that manner due to his condition. Hayes did not cease despite this admonition.

145.   Hayes failed to document his use of force in an incident report, to report his use of force to his immediate supervisor, and to log his use of force into the 6-B pod log book, which are all required by the written jail (supposed) policies.

146.   Hayes's attack left Mr. Mayer with temporary paralysis.

147.   No one has been held accountable for attacking Mr. Mayer.

148.   The treatment this individual endured is consistent with the jail's custom, policy, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

**Jail staff moved Joseph Sawyer from his wheelchair to restraint chair, beat, and pepper sprayed him for no reason.**

149.    In October 2018, Joseph Sawyer was booked into the jail. Mr. Sawyer is confined to a wheelchair due to a degenerative bone condition. Without any legitimate reason to do so, jail staff removed Mr. Sawyer from his wheelchair and strapped him into a restraint chair, slapped and punched his face, and pepper sprayed him.

150.    Jail staff failed to effectively decontaminate Mr. Sawyer from the pepper spray and refused to permit him to shower or change clothes for more than a week. Jail staff also denied him the use of a wheelchair.

151.    The jail held no one accountable.

152.    The treatment this individual endured is consistent with the jail's custom, policy, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

**Defendant Smith violently shoved Timothy Bennett while he was receiving an injection from medical staff.**

153.    On information and belief, the same day in November 2018 that Defendant Smith threatened Mr. Lawrence and other inmates who had reported abuses to the marshals, Smith also attacked Timothy Bennett as he was receiving an injection from medical staff, pushing Bennett while the needle was inserted in his back.

154.    On information and belief, Corporal Honaker actually wrote up Smith for this violent outburst. Compared with the many, many times that corrections staff imposed punitive violence with no consequence, Honaker's isolated write up of Smith was an anomaly.

155.    On information and belief, this stray instance of showing mild displeasure at an SRT officer hurting someone in custody was motivated by either the presence of medical staff during the incident or the ongoing federal investigation that Smith was furious about.

**Jail staff restrained, beat, and pepper sprayed Antoine Blackshear without legitimate reason to do so.**

156.    In December 2018, without any legitimate reason to do so, jail staff confined Antoine Blackshear to a restraint chair, beat him, and pepper sprayed him.

157.    Jail staff failed to adequately decontaminate Mr. Blackshear before releasing him.

158.    The jail held no one accountable.

159.    The treatment this individual endured is consistent with the jail's custom, policy, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

**A corrections officer pepper sprayed and restrained Margaret Jackintell for objecting to his verbal abuse of other inmates.**

160.    Margaret Jackintell is a 57-year old Navy veteran. She was booked into the county jail in December 2018.

161.    While incarcerated, she observed a corrections officer verbally abusing other incarcerated women. She voiced her disagreement at the way he was addressing them. Corrections staff responded savagely, tackling her to the ground and triggering an anxiety attack. A guard saturated her with pepper spray before strapping her into a restraint chair.

162.    Jail staff left Ms. Jackintell in the restraint chair, covered in pepper spray, for approximately 12 hours. During that time she was denied food, water, or the opportunity to use the restroom facilities.

163.    For days after she was released from the chair, corrections staff refused to allow her to shower or clean herself.

164.    After she endured this abuse, a supervisor named Bitterman repeatedly came to her cell to taunt her saying, e.g., "You're no fucking kind of veteran, you fucking bitch! I don't believe you're a veteran."

165.    The jail held no one accountable.

166.    The treatment this individual endured is consistent with the jail's custom, policy, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

### Corrections officers beat Terrence Debose while he was strapped into a restraint chair.

167.    On March 22, 2019, a corrections officer strapped Terrence Debose in a restraint chair in a small cell. Mr. Debose suffers from mental illness.

168.    While Mr. Debose was restrained, Officer Nicholas Evans turned off his body-worn camera and repeatedly punched Mr. Debose in the face. Another corrections officer, Timothy Dugan, entered the room and joined in the abuse, punching Mr. Debose twice in the face.

169.    As a result of the attack, Mr. Debose suffered a concussion.

170.    Evans was indicted for felonious assault and Dugan was indicted for misdemeanor assault.

171.    The jail held no one accountable.

The treatment this individual endured is consistent with the jail's custom, policy, and practice of using excessive force as a punitive measure and otherwise victimizing and abusing the individuals detained there.

172.    On information and belief, there are incidents of excessive force and abuse by corrections officers—including retaliatory and punitive use of restraints and pepper spray—in addition to those listed above.

### CLAIM 1
### FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983 FOR A CUSTOM, POLICY, PATTERN, OR PRACTICE TOLERATING THE USE OF EXCESSIVE FORCE (AGAINST CUYAHOGA COUNTY)

173.    Mr. Lawrence incorporates all previous allegations.

174.     Defendant Cuyahoga County permits, tolerates, and is deliberately indifferent to a pattern and practice of excessive force by its corrections officers at the jail. This widespread tolerance of excessive force by corrections officers constitutes a county policy, practice, pattern, or custom, and led to Mr. Lawrence being confined to a restraint chair, attacked in the elevator, abused in his cell, threatened with death, and retaliated against for cooperating with federal investigators.

175.     The behavior of the individual Defendants and their coworkers is part of a recurring pattern of excessive force used on the people in custody at the county jail.

176.     Corrections personnel failed to take basic, appropriate steps to protect Mr. Lawrence from violence or to intervene when he was subjected to it.

177.     Cuyahoga County's customs, policies, patterns, and practices have created a toxic culture that has desensitized its corrections personnel to brutal, sadistic violence at the jail because that violence is something wholly unremarkable. It was a workplace "game" for Defendant Little to attack Mr. Lawrence in an elevator where everyone knows the security cameras don't work. If the County wanted to prevent this, it would have swiftly replaced the faulty camera. The individual Defendants' savage and casual resort to violence is an ordinary aspect of jail culture that those incarcerated have learned to expect and that those responsible for overseeing the jail staff have fostered and tolerated.

178.     Based on previous instances of unjustified use of excessive force (some of which are described above), Defendant Cuyahoga County had notice of a pattern of constitutionally offensive acts by its corrections officers but failed to take any remedial steps in response to the notice.

179.     The culture of the punitive violence cultivated at the county jail was apparent to federal investigators who assessed the facility last year.

180.     According to the Quality Assurance Review of the Cuyahoga County Corrections

Center, the United States Marshals Service found the following deficiencies related to use of

force:

   a.   "Review of Use of Force (UOF) incidents determined staff are not utilizing all
        tools and techniques generally accepted as best practices for UOF teams to ensure
        staff and detainee safety (i.e., confrontation avoidance, UOF team concept, team
        briefings and debriefings, removing staff involved at the on-set of the incident
        from the immediate area, and a review of all UOF incidents by the agency
        administrator or designee, and medical assessment of all involved). Additionally,
        video tapes involving UOF are not tagged and labeled as evidence. Written
        reports are not required from all persons involved in the use of force or any staff
        who played a role in the incident (i.e., medical, correctional personnel, SRT,
        etc.)." *Id.* at 35.

   b.   "Over 100 detainee/inmate interviews reveal strong and consistent allegation of
        brutality, UOF punishment, and cruel treatment at the hands of Security
        Response Team (SRT), whom the detainee/inmates refer to as "The Men in
        Black," based on their black para-military uniforms." *Id.'*

   c.   "During the review, review team members observed SRT members verbally
        abusing and demonstrating aggressive behavior towards detainees/inmates;
        review of multiple UOF and SRT body-cam video reveal and contain aggressive
        conduct and behavior as well as abusive, explicit language used by SRT members
        directed at detainees/inmates." *Id.*

   d.   "SRT members who were escorting detainee/inmates to be interviewed by
        Facility Review Team members were referring to requested detainee/inmates as
        "Snitches," as they escorted them to and from the interview location. The
        threatening, intimidating and aggressive behavior demonstrated and witnessed by
        the Facility Review Team resulted in the request to remove up to 10
        detainee/inmates from the CCCC, for fear of SRT members retaliation, and the
        legitimate fear of detainee/inmate safety." *Id.*

181.     By permitting, tolerating, and sanctioning a persistent and widespread policy, practice,

pattern, and custom of corrections officers using excessive force against people in custody, under

which Mr. Lawrence was repeatedly victimized, Defendant Cuyahoga County deprived Mr.

Lawrence of rights, remedies, privileges, and immunities guaranteed to every citizen of the

United States.

182.    As a direct and proximate result of the Defendant County's unlawful conduct, Mr.

Lawrence suffered and will continue to suffer economic and non-economic damages for which

this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and

suffering.

### CLAIM 2
### FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983 FOR DELIBERATE INDIFFERENCE/FAILURE TO TRAIN AND SUPERVISE CORRECTIONS OFFICERS (AGAINST CUYAHOGA COUNTY)

183.    Mr. Lawrence incorporates all previous allegations.

184.    Defendant Cuyahoga County permits, tolerates, and is deliberately indifferent to its

failure to train and supervise corrections officers on how to protect people from known threats

and how to interact with people in custody, including use of restraints and chemical agents as

punishment, use of force on an person who is handcuffed and obedient, use of threats and

punishment to curtail protected speech, and providing access to basic hygiene and necessities of

human life.

185.    Defendant Cuyahoga County failed to train and supervise its corrections officers on how

to use the best use-of-force tactics to ensure the safety of incarcerated citizens. The behavior of

the individual Defendants, and the other employees who did nothing after Mr. Lawrence was

repeatedly victimized, is consistent with a recurring pattern of how corrections officers interact

with people in custody at the jail, due to a lack of training and accountability.

186.    Defendant Cuyahoga County had notice of its failure to train and supervise its corrections

personnel, which resulted in a pattern of constitutionally offensive acts by its corrections officers.

The Defendant County failed to take any remedial steps in response to the notice. Staff confined

Mr. Lawrence to a restraint chair for speaking Spanish. Staff failed to ensure that Mr. Lawrence

was kept separate from Mr. Norris or protected from him once he made explicit threats against

Mr. Lawrence. After Defendant Little attacked Mr. Lawrence, Corporal Honaker and

Defendant Smith did not report the attack, and Smith rejected Mr. Lawrence's reasonable

request to receive medical attention. No one followed up to ensure Mr. Lawrence received

medical attention after Defendant Little dragged Mr. Lawrence from the exam room where he

was about to have his head wound treated. Defendant Smith laughed at Mr. Lawrence and

offered nothing but a paper towel despite his evident injury. Doe 2 threatened to mace and *murder*

Mr. Lawrence and "make it look like a suicide" because he asked to shower. Defendant Smith

threatened the men in pod 10-B who cooperated with the federal investigation into deplorable

jail conditions and abuses. And corrections staff served Mr. Lawrence rotten food because he

spoke to investigators about the abuse and corruption at the jail.

187.    Corrections staff behaved this way because it was consistent with Defendant Cuyahoga

County's culture of retaliatory violence and abuse against the people detained in its jail.

188.    On information and belief, Defendant Cuyahoga County has, despite notice, tolerated

and nurtured its corrections officers' violent and abusive conduct by failing to intervene and

prevent abuse. The County was deliberately indifferent to the obligation to train corrections

officers on how to behave.

189.    For example, Defendant Cuyahoga County tolerated and failed to prevent the incidents

of excessive force against numerous incarcerated citizens including, but not limited to, Glenn

Mayer Jr., Tyrone Hipps, Jr., Joshua Castleberry, Terrence Debose, Chantelle Glass, Blanche

Hill, Antione Blackshear, Joseph Sawyer, Margaret Jackintell, Timothy Bennett, and others.

190.    According to the Quality Assurance Review of the Cuyahoga County Corrections

Center, the United States Marshals Service found the following training deficiencies:

  a.  "Denial of detainees/inmates to perform hygiene, detainees/inmates are not
      allowed access to showers, telephones and recreation due to CCCC's
      implementation of a lockdown system known as "Red Zone." The "Red Zone"

RHU detainees/inmates management system is used as a means to address insufficient staff and staffing shortages. Detainees/inmates housed in the "Red Zone" RHU are locked down for periods of 27 or more hours in their cells, additionally interviews with detainees/inmates in the "Red Zone" RHU are lockdown, along with inspection of their cells reveal the absence of toothbrushes, toothpaste, toilet paper and denied access to razors or barbering." *Id.* at 4.

b. "There is no internal quality control plan in place to provide an annual review of CCCC's operations to ensure compliance to ensure compliance with CCCC's policies and procedures. CCCC is inspected annually by the Ohio Department of Rehabilitation and Corrections' Bureau of Adult Detention to determine compliance with the Ohio's Minimum Standards for Adult Detention Centers. The last inspection was on November 14, 2017; review of the November 14, 2017 previous inspection documentation reveal CCCC's staff did not comply, address or provide corrective actions for identified deficiencies which included: exceeding rated capacity, lack of natural lighting in housing units, and detainees/inmates not being provided with five hours a week of exercise. A corrective action plan to address the aforementioned identified deficiencies was not provided for review." *Id.* at 26.

c. "Sheriff's Deputies provide transportation and outside escort for detainees/inmates. Therefore, Correctional Officers do not carry firearms, nor do they receive specialized firearms training. Staff authorized to use chemical agents receive required training. A review of management and supervisory staff training files reveal management and supervisory staff receive 40 hours of management and supervisory training during their first year and only 8 hours annually as required by the Ohio Minimum Adult Detention Standards. FPBDS requires management and supervisory staff receive an initial 40 hours training the first year and 24 hours thereafter." *Id.* at 28-29.

d. "There is no policy in place requiring notification to the agency of jurisdiction of serious incidents involving detainees/inmates. Additionally, no documentation was provided for review to support the practice of external agency notifications." *Id.* at 29.

e. "Interview with staff reveal numerous staff at all levels express concerns for their safety and security due to staffing shortages; concerns were also expressed regarding morale and sense of inability to make changes or voice concerns to leadership or management." *Id.* at 29.

191.     By permitting, tolerating, and sanctioning a persistent and widespread policy, practice, and custom of deliberate indifference to failing to train and supervise corrections officers not to use excessive force, to provide medical care to people in distress, to permit access to showers and food, and to generally follow its written policies rather than its actual abusive customs, policies,

patterns, and practices, Defendant Cuyahoga County deprived Mr. Lawrence of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States.

192.     As a direct and proximate result of Defendant Cuyahoga County's unlawful conduct, Mr. Lawrence suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

### CLAIM 3
### FIRST AND FOURTEENTH AMENDMENT (RETALIATION) UNDER 42 U.S.C. § 1983 (AGAINST CUYAHOGA COUNTY)

193.     Mr. Lawrence incorporates all previous allegations.

194.     Defendant Cuyahoga County created a custom, policy, pattern, and practice of permitting retaliation against incarcerated citizens for speaking out about abuse or corruption in the jail, including permitting retaliation against the individuals who were cooperating with the federal investigation into jail conditions.

195.     As part of the jail's entrenched snitching-abatement protocol—which was in full effect well before the federal marshals appeared in late October 2018—staff engaged in verbal and physical abuse of incarcerated men and women for speaking out on matters of public concern in the jail.

196.     When corrections staff learned of the federal investigation into jail conditions, the staff made no effort to hide their anger at those cooperating. The retaliatory climate was instant and obvious to both rank-and-file and supervisory employees.

197.     Defendant Cuyahoga County took no steps to address or remedy the retaliation SRT officers were dishing out until Chief Anderson from the Marshals Service complained to Sheriff Pinkney. Only once it was clear that the federal government knew what the SRT officers were up to did the County take any steps to address the retaliation. The County did absolutely nothing to

hold the retaliators accountable, thereby sending a powerful message regarding its continuing tolerance for staff abuses.

198.    Even after he was transferred to the County's Euclid annex, Mr. Lawrence faced retaliation for reporting abuse to the marshals. This continuation of retaliation demonstrates that the staff's response both at main jail and Euclid was consistent with the County's custom, policy, pattern, and practice that created the corrupt and abusive conditions in the first place.

199.    As a direct and proximate result of Defendant Cuyahoga County's unlawful conduct, Mr. Lawrence suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

### CLAIM 4
### FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS VIOLATION UNDER
### 42 U.S.C. § 1983 (AGAINST CUYAHOGA COUNTY)

200.    Mr. Lawrence incorporates all previous allegations.

201.    Defendant Cuyahoga County was deliberately indifferent to its duty to protect Mr. Lawrence, its duty to not to use or threaten to use needless force or cause him bodily harm, and its duty to provide him with clearly needed medical care. Cuyahoga County's failures show its utter disregard for Mr. Lawrence's constitutional rights in a manner that shocks the conscience.

202.    Defendant Cuyahoga County has a custom, policy, pattern, and practice of confining individuals in its custody to restraint chairs as a punitive measure. These restraints are imposed in a malicious and sadistic manner for the very purpose of causing harm.

203.    Mr. Lawrence was harmed by the County's policy of imposing needless force to restrain those in its custody when he was confined to a restraint chair for speaking Spanish during his booking.

204.    Defendant Cuyahoga County allowed Mr. Norris to attack Mr. Lawrence after he had advised jail officials of the risk Norris posed and Norris himself alerted corrections staff to his malicious intent by running his mouth about he was about to "crash out" and "go to the hole" because he was going to "fuck this n***** up" (referring to Mr. Lawrence).

205.    Defendant Cuyahoga County has a custom, policy, pattern, and practice of imposing needless force and threats of force on those in its custody. This force is threatened and imposed in a malicious and sadistic manner for the very purpose of causing harm.

206.    Mr. Lawrence suffered repeatedly due to the County's policy of threatening and imposing needless force include the elevator beatdown by Defendant Little (while Mr. Lawrence was handcuffed and compliant), Little's threat that Mr. Lawrence should keep him mouth shut about the elevator beatdown, Defendant Doe 2's threat to mace and murder Mr. Lawrence and "make it look like a suicide," Defendant Hickerson's slamming Mr. Lawrence's head against his cell wall (while Mr. Lawrence was handcuffed and compliant), and the retaliation campaign SRT personnel perpetrated as incarcerated citizens reported constitutional and criminal abuses in the jail to federal investigators.

207.    Defendant Cuyahoga County had a custom, policy, pattern, and practice of failing to provide clearly needed medical care to those within its custody.

208.    Mr. Lawrence suffered as a result of the County's failure to provide clearly needed medical care. While he was having his blood drawn in the infirmary, medical staff observed his head wound from the Little beatdown, which had not been there during his first visit to medical that morning. After Defendant Little dragged Mr. Lawrence out of the infirmary, no one did anything to ensure that Mr. Lawrence received the treatment he obviously needed for the wound on his head.

209.    The kind of casual cruelty that Mr. Lawrence experienced in the jail is far from unique. That this is how the County elects to operate its jail shocks the conscience.

210.    As a direct and proximate result of Defendant Cuyahoga County's unlawful conduct, Mr. Lawrence suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

## CLAIM 5
### FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS VIOLATION UNDER 42 U.S.C. § 1983 (AGAINST DEFENDANT CUYAHOGA COUNTY)

211.    Mr. Lawrence incorporates all previous allegations.

212.    As detailed above, the jail never gave Mr. Lawrence a hearing on the severe administrative-segregation restrictions to which it subjected him following the Norris attack, thus subjecting him to unfair deprivations without due process.

213.    As a direct and proximate result of Defendant Cuyahoga County's unlawful conduct, Mr. Lawrence suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

## CLAIM 6
### FOURTEENTH AMENDMENT EXCESSIVE-FORCE VIOLATION UNDER 42 U.S.C. § 1983 (AGAINST DEFENDANTS DOE 1, LITTLE, AND HICKERSON IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES)

214.    Mr. Lawrence incorporates all previous allegations.

215.    Defendant Doe 1 purposefully and knowingly used objectively unreasonable force against Mr. Lawrence.

216.    Defendant Doe 1 strapped Mr. Lawrence to a restraint chair for hours because he was speaking Spanish. That use of force was unnecessary, gratuitous, and objectively unreasonable.

217.    Defendant Little purposefully or knowingly used objectively unreasonable force against Mr. Lawrence, who was silent, obedient, and handcuffed.

218.    Defendant Little bashed Mr. Lawrence's head into the wall of the elevator, while he was handcuffed and following instructions. That use of force was unnecessary, gratuitous, and objectively unreasonable.

219.    Defendant Little punched, kicked and stomped on Mr. Lawrence while he laid handcuffed on the floor of the elevator. That use of force was unnecessary, gratuitous, and objectively unreasonable.

220.    Defendant Little's use of excessive force was premeditated: he said "let's play a game" just before viciously attacking Mr. Lawrence.

221.    Defendant Hickerson purposefully or knowingly used objectively unreasonable force against Mr. Lawrence, who was silent, obedient, and handcuffed.

222.    Defendant Hickerson bashed Mr. Lawrence's head into the wall of his cell, while he was handcuffed and following instructions. That use of force was unnecessary, gratuitous, and objectively unreasonable.

223.    All the facts and circumstances surrounding these incidents cannot be viewed subjectively or objectively to support any use of force, let alone the extreme level of force these Defendants used, or their failure to file use of force reports or related documentation.

224.    As a direct and proximate result of these Defendants' unlawful and sadistic conduct, Mr. Lawrence suffered and will continue to suffer economic and non-economic damages for which these Defendants are liable, including, but not limited to, mental, emotional, and physical pain and suffering.

225.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter these Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 7
### FIRST AND FOURTEENTH AMENDMENT VIOLATION (RETALIATION) UNDER 42 U.S.C. § 1983 (AGAINST DEFENDANTS LITTLE, SMITH, HICKERSON, AND DOE 2 IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES)

226.    Mr. Lawrence incorporates all previous allegations.

227.    In response to Mr. Lawrence's efforts to report Defendant Little's abuse to jail medical staff, Little yanked Mr. Lawrence from the treatment room and threatened him.

228.    In response to Mr. Lawrence's requests to be granted access to basic hygiene, Defendant Doe 2 threatened to pepper-spray and kill Mr. Lawrence.

229.    In response to Mr. Lawrence's requests to be granted access to basic hygiene, Defendant Hickerson bashed Mr. Lawrence's head against the wall of his cell.

230.    In response to Mr. Lawrence's cooperation with federal investigators looking into corruption and abuse in the county jail, Defendant Smith threatened Mr. Lawrence.

231.    Mr. Lawrence engaged in protected conduct when he indicated to medical staff that Defendant Little was to blame for the injuries Mr. Lawrence presented with the second time in the medical unit on October 18, 2018, when he complained about being denied access to basic hygiene, and when he repeatedly spoke to federal investigators regarding misconduct of Cuyahoga County corrections officers. Each of the subjects on which he engaged are matters of public concern.

232.    Defendants' actions in response to Mr. Lawrence's protected conduct would chill a person of ordinary firmness from exercising his right to speak out on matters of public concern.

233.    As a direct and proximate result of these Defendants' unlawful conduct, Mr. Lawrence suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including, but not limited to, mental, emotional, and physical pain and suffering.

234.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 8
### FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS VIOLATION UNDER 42 U.S.C. § 1983 (AGAINST DEFENDANTS DOE 1, WITT, LITTLE, SMITH, DOE 2, AND HICKERSON IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES)

235.    Mr. Lawrence incorporates all previous allegations.

236.    As detailed above, each of the individual Defendants engaged in conduct that deprived Mr. Lawrence of his liberty and that shocks the conscience.

237.    As detailed above, Defendant Doe 1 intentionally confined Mr. Lawrence to a restraint chair for speaking Spanish. There was no need to impose any force at all on Mr. Lawrence. Individuals speaking Spanish are regularly booked into the jail. Speaking Spanish does not justify imposing any force on someone. Doe 1's use of any force under the circumstances shocks the conscience.

238.    As detailed above, Defendant Witt intentionally failed to protect Mr. Lawrence from the attack by Mr. Norris either before or during the attack. Witt intentionally unlocked Mr. Lawrence's cell door despite Mr. Norris's threats to harm Mr. Lawrence and that fact that Norris was hovering at the cell door poised to attack. And Witt made no effort whatsoever to intervene once the attack her conduct had facilitated was underway. Witt failed to even issue a verbal directive to Mr. Norris either to stop attacking Mr. Lawrence or to leave his cell. Witt's failure to protect Mr. Lawrence shocks the conscience.

239.    As detailed above, Defendant Little, having intentionally failed to activate his body camera, intentionally attacked a handcuffed and compliant Mr. Lawrence in the elevator with broken security cameras (of which Little and everyone else was aware). This use of force was malicious and sadistic and imposed for the very purpose of causing harm. Little's unprovoked

and brutal attack on Mr. Lawrence shocks the conscience, as does Little's directive not to disclose what he had done.

240.    As detailed above, Defendant Smith failed to provide Mr. Lawrence with clearly needed medical care and intimidated him for cooperating with federal investigators who were looking into jail conditions including use of needless and excessive force against those in custody. Smith's deliberate indifference to Mr. Lawrence's medical needs and efforts to dissuade and intimidate Mr. Lawrence from revealing what Little had done shocks the conscience.

241.    As detailed above, Defendant Doe 2 threatened to mace Mr. Lawrence and to hang him and make it look like a suicide. This conduct shocks the conscience.

242.    As detailed above, Defendant Hickerson bashed Mr. Lawrence's head against his cell wall while he was handcuffed and compliant. This conduct shocks the conscience.

243.    As a direct and proximate result of these Defendants' unlawful and conscience-shocking conduct, Mr. Lawrence suffered and will continue to suffer economic and non-economic damages for which these Defendants are liable, including, but not limited to, mental, emotional, and physical pain and suffering.

244.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 9
### INTENTIONAL TORT—ASSAULT
### (AGAINST DEFENDANTS DOE 1, LITTLE, HICKERSON, AND DOE 2 IN THEIR INDIVIDUAL CAPACITIES)

245.    Mr. Lawrence incorporates all previous allegations.

246.    Defendants Doe 1, Little, Hickerson, and Doe 2's above-described intentional actions caused Mr. Lawrence reasonable apprehension of immediate harmful or offensive contacts.

247. As a direct and proximate result of these Defendants' unlawful activity, Mr. Lawrence has suffered and continues to suffer economic and non-economic damages for which these Defendants are liable.

248. These Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

<div align="center">

**CLAIM 10**
**INTENTIONAL TORT—BATTERY**
**(AGAINST DEFENDANTS DOE 1, LITTLE, AND HICKERSON IN THEIR**
**INDIVIDUAL CAPACITIES)**

</div>

249. Mr. Lawrence incorporates all previous allegations.

250. Defendant Doe 1 confined Mr. Lawrence to a restraint chair for hours without any cause or privilege to do so.

251. Defendant Little viciously attacked a handcuffed Mr. Lawrence in an elevator without working surveillance cameras, smashing his head into the wall and punching and kicking him while he lay on the ground.

252. Defendant Hickerson repeatedly banged Mr. Lawrence's head against the wall of his cell.

253. Defendants engaged in the above-described actions intending to cause the harmful contact and the harmful contact resulted. The offensive contacts were unlawful and unwanted.

254. As a direct and proximate result of these Defendants' unlawful conduct, Mr. Lawrence suffered and will continue to suffer economic and non-economic damages for which these Defendants are liable, including, but not limited to, mental, emotional, and physical pain and suffering.

255.     These Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 11
### INTIMIDATION UNDER R. C. § 2921.03
### (AGAINST DEFENDANTS DOE 1, WITT, LITTLE, SMITH, HICKERSON, AND DOE 2 IN THEIR INDIVIDUAL CAPACITIES)

256.     Mr. Lawrence incorporates all previous allegations.

257.     Defendants Little, Smith, and Doe 2 knowingly threatened Mr. Lawrence to attempt to influence, intimidate, or hinder him as a witness to criminal misconduct by corrections staff in the jail and to prevent him from cooperating with federal marshals investigating jail conditions.

258.     Regarding the treatment Mr. Lawrence sustained in the jail, the individual Defendants filed, recorded, failed to file or record, or otherwise used materially false or fraudulent writings with malicious purpose, in bad faith, or in a wanton and reckless manner to attempt to influence, intimidate, or hinder a public servant or witness in the discharge of that person's duty.

259.     As a direct and proximate result of these Defendants' criminal conduct, which showed a spirit of ill-will, hatred, and wanton disregard of Mr. Lawrence's rights, Mr. Lawrence has suffered and will continue to suffer economic and non-economic damages for which these Defendants are liable, including, but not limited to mental, emotional, and physical pain and suffering, as well as punitive damages.

260.     Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

## CLAIM 12
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER R. C. § 2307.60(A)(1)
### (AGAINST DEFENDANTS DOE 1, WITT, LITTLE, SMITH, HICKERSON, AND DOE 2 IN THEIR INDIVIDUAL CAPACITIES)

261.     Mr. Lawrence incorporates all previous allegations.

262.    The conduct complained of above constitutes criminal acts on the part of the individual

Defendants. The crimes include, but are not limited to,

      a.    felonious assault (R.C. 2903.11(A)(1));

      b.    assault (R.C. 2903.13(A));

      c.    interfering with civil rights (R.C. 2921.45(A));

      d.    unlawful restraint (R.C. 2905.03(A));

      e.    intimidation (R.C. 2921.03(A));

      f.    aggravated menacing (R.C. 2903.21(A));

      g.    menacing by stalking (R.C. 2903.211(A)(1));

      h.    menacing (R.C. 2903.22(A)); and

      i.    dereliction of duty (R.C. 2921.44(C)(2)).

263.    As a direct and proximate result of the individual Defendants' intentional, knowing, and

purposeful criminal conduct, which showed a spirit of ill-will, hatred, and wanton disregard of

Mr. Lawrence's rights, Mr. Lawrence has suffered and will continue to suffer economic and non-

economic damages for which these Defendants are liable, including, but not limited to mental,

emotional, and physical pain and suffering, as well as punitive damages.

264.    These Defendants' acts were willful, egregious, malicious, and worthy of substantial

sanction to punish and deter Defendants and others from engaging in this type of unlawful

conduct.

### PRAYER FOR RELIEF

For the reasons stated, Mr. Lawrence respectfully requests the following relief from the Court:

    A.    Declare that Defendants' acts and conduct constitute violations of the First and
        Fourteenth Amendments to the United States Constitution, as well as of
        42 U.S.C. § 1983 and state law;

B.    Enter judgment in Mr. Lawrence' favor on all claims for relief;

C.    Award full compensatory damages including, but not limited to, damages for pain and suffering, mental anguish, emotional distress, that Mr. Lawrence have suffered and are reasonably certain to suffer in the future;

D.    Award punitive and exemplary damages for the individual Defendants' egregious, willful, and malicious conduct;

E.    Award pre- and post-judgment interest at the highest lawful rate;

F.    Award Mr. Lawrence their reasonable attorneys' fees and all other costs of suit;

G.    Enjoin Defendants from perpetrating further unlawful acts such as the ones that injured Mr. Lawrence; and

H.    Award all other relief in law or equity, including injunctive relief, to which Mr. Lawrence is entitled and that the Court deems equitable, just, and proper.

## JURY DEMAND

Mr. Lawrence demands a trial by jury on all issues within this complaint.

Respectfully submitted,

THE CHANDRA LAW FIRM LLC

*/s/ Ashlie Case Sletvold*
Ashlie Case Sletvold (Ohio Bar No. 0079477)
Subodh Chandra (Ohio Bar No. 0069233)
Brian Bardwell (Ohio Bar No. 0098423)
The Chandra Law Building
1265 W. 6th St., Ste. 400
Cleveland, Ohio 44113
216.578.1700 Phone
216.578.1800 Fax
Ashlie.Sletvold@ChandraLaw.com
Subodh.Chandra@ChandraLaw.com
Brian.Bardwell@ChandraLaw.com

*Attorneys for Plaintiff Corrionne Lawrence*

From:    Anderson, Theo (USMS)
Sent:    11/1/2018 6:51:19 PM
To:      Clifford E. Pinkney Kenneth V. Mills Eric J. Ivey George J. Taylor Brandy Carney
Cc:      Rao, Preetham C. (CV) (FBI) Elliott, Peter (USMS) Sheehan, John (USMS)
Subject: RE: Whistleblowing Protection

Sheriff,

   The pleasure was truly mine, I look forward to working with you and helping you anyway I can; thank you so much for your immediate and expedient attention, assistance and support with the relocation request.

   V/r

Theo

Theo Anderson, Chief
Office of Detention Standards and Compliance
Prisoner Operations Division
Headquarters United States Marshals Service
(703) 217-2357

From: Clifford E. Pinkney [mailto:cpinkney@cuyahogacounty.us]
Sent: Thursday, November 1, 2018 5:42 PM
To: Anderson, Theo (USMS) <TAnderson42@usms.doj.gov>; Kenneth V. Mills <kmills@cuyahogacounty.us>; Eric J. Ivey eivey@cuyahogacounty.us; George J. Taylor egtaylor2@cuyahogacounty.us>; Brandy Carney <bcarney@cuyahogacounty.us>
Cc: Rao, Preetham C. (CV) (FBI) <pcrao@fbi.gov>
Subject: Re: Whistleblowing Protection

Mr. Anderson

Thank you very much for your dedication and attention I truly appreciate it. I was a complete pleasure meeting you today and hearing your feedback. I am going to forward your request to the Director and Warden and have them make arrangements today. Again thank you talk soon.

Director Mills take care of this immediately please, thank you.

Get Outlook for iOS

From: Anderson, Theo (USMS) <theo.anderson@usdoj.gov>
Sent: Thursday, November 1, 2018 1:54 PM
To: Clifford E. Pinkney
Cc: Rao, Preetham C. (CV) (FBI)
Subject: Whistleblowing Protection

Sheriff Pinkney,

   It was my honor and pleasure to meet you; I respectfully request the following Cuyahoga County Jail inmates be placed in protection or moved from the Cuyahoga County Jail for their personal safety and protection from the Security Response Team (SRT) staff.  The below individuals currently housed in the Cuyahoga County Jail are in fear of their life for

EXHIBIT

1

"whistleblowing" on staff corruption and assault.

I respectfully request these individuals be removed and relocated immediately, for their safety and protection, as they fear for their live and personal safety:

**Corrionne Lawrence 0287562** (Sir he must be moved today, the SRT is actively threatening and targeting him!!!)

- Brandon Singleton 0287666
- Rajuan Jackson 0332028
- Ramone Cargill 0292961
- Clarence Bogan 0102304
- Richard Morris 0253059
- Jonathan Rivera
- James Jones 0217105
- William Ambler 19196708

These two individuals are fine and were scared they would be relocated from the Bedford Annex, back to the Cuyahoga County Jail, after talking with the Review Team Members:

Robert Smith 0125505
Adam Fellows 0235545

Sir, I thank you very much for you time, assistance and consideration and look forward to continuing to work with you in the future.

V/r

Theo Anderson, Chief
Office of Detention Standards and Compliance
Prisoner Operations Division
Headquarters United States Marshals Service
(703) 217-7309

Any information and or file(s) transmitted with it are the property of the County of Cuyahoga, Ohio and are intended solely for the use of the individual or entity to whom this is addressed. If you are not one of the named recipient(s) or otherwise have reason to believe that you have received this information error, please notify the sender and delete this immediately from your desktop or mobile electronic device. Any other use, retention, dissemination, forwarding, printing or copying of this information and/or attached file(s) is strictly prohibited.